# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DAVID A. HOELLER,                    :
                                     :
                    Plaintiff,       :
                                     :
          v.                         :      **C.A. No. 2018-0336-JRS**
                                     :
TEMPUR SEALY INTERNATIONAL,          :
INC.,                                :
                                     :
                    Defendant.       :


# MEMORANDUM OPINION

Date Submitted:  November 8, 2018
Date Decided:  February 12, 2019

Thomas A. Uebler, Esquire of McCollom D'Emilio Smith Uebler LLC, Wilmington, Delaware; Melinda A. Nicholson, Esquire of Kahn Swick & Foti, LLC, New Orleans, Louisiana; and Roger Sachar, Esquire of Newman Ferrara LLP, New York, New York, Attorneys for Plaintiff.

Kenneth J. Nachbar, Esquire and Sabrina Hendershot, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Jordan D. Hershman, Esquire and Sarah Paige, Esquire of Morgan, Lewis & Bockius LLP, Boston, Massachusetts; and Michael D. Blanchard, Esquire of Morgan, Lewis & Bockius LLP, Hartfort, Connecticut, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

"Stockholders of Delaware corporations enjoy a qualified right to inspect the corporation's books and records."[1]  "The right to inspection is qualified out of considerations that are practical, rather than equitable; if a stockholder were permitted to inspect records out of a sense of mere curiosity, or to satisfy a desire to oversee matters properly within the province of corporate management or the corporate board, a considerable expense and distraction would be foisted upon the company and its (less curious) stockholders, with likely little value in return."[2]

To be sure, the burden a stockholder bears to justify inspection is low.  And this Court does not hesitate to enforce inspection rights when the stockholder meets that burden and demonstrates that he has satisfied the statutory form and manner requirements.  But the Court cannot view the stockholder's burden as a mere speed bump.  When the corporation resists the stockholder's demand for books and records, the Court must put the stockholder plaintiff to his proof.  This is one those rare instances in the realm of Section 220 litigation where the plaintiff's trial proof has come up short.

For two decades, Defendant, Tempur Sealy International, Inc., supplied mattresses, bedding and furniture to Mattress Firm Holding Company ("Mattress

---

[1] *Cent. Laborers Pension Fund v. News Corp.,* 45 A.3d 139, 143 (Del. 2012).

[2] *Se. Pa. Transp. Auth. v. Abbvie, Inc.*, 2015 WL 1753033, at *10 (Del. Ch. Apr. 15, 2015).

Firm") for sale in Mattress Firm stores across the country. Mattress Firm eventually became Tempur Sealy's largest customer, accounting for more than 20% of Tempur Sealy's sales. The relationship changed, however, in August 2016 when Mattress Firm was acquired by a European company with a vertically integrated product line that included a mattress supply chain. Despite the risk that Mattress Firm's supply needs might be met by its new parent, Tempur Sealy's CEO, Scott L. Thompson, repeatedly told the market he was optimistic about the strength of Tempur Sealy's continuing relationship with Mattress Firm. His optimism was misplaced. In January 2017, Mattress Firm terminated its contracts with Tempur Sealy and breach of contract litigation between the parties soon followed.

Plaintiff, David A. Hoeller, is a Tempur Sealy stockholder. He contends that Tempur Sealy's relationship with Mattress Firm was so significant, and the termination of the Mattress Firm contracts was so abrupt, that the Tempur Sealy board of directors and senior management must have breached their fiduciary duties by failing to retain Mattress Firm's business and by exposing Tempur Sealy to breach of contract damages. He also alleges that Thompson's words of assurance to the market were false when spoken, thus exposing him to breach of fiduciary duty liability and the company to securities fraud liability.

Plaintiff's mismanagement theory is, in essence, a "where there's smoke there's fire" syllogism. Indeed, when pressed to articulate the theory at trial,

2

Plaintiff's counsel responded that a customer of Mattress Firm's significance "doesn't, at the drop of a hat, just leave. Something smells. There is smoke. I suspect there's fire."[3] This, then, presents the questions of whether the "smoke and fire" circumstantial connection that Plaintiff seeks to draw holds up in the evidence and whether it alone is adequate to justify inspection. Similarly, with respect to Plaintiff's purpose of investigating the truth of Thompson's public assurances regarding the strength of the Tempur Sealy/Mattress Firm relationship, the question is whether Plaintiff's theory that "Thompson must have known his statements were false when made because the relationship was terminated three months later" is too thin a reed upon which to rest a "credible basis" finding of wrongdoing.

After carefully considering the evidence, I decline as factfinder to find that Tempur Sealy's failure to renegotiate the Mattress Firm contracts, the termination of the Tempur Sealy/Mattress Firm relationship or the fact of contract litigation between Tempur Sealy and Mattress Firm provide any credible basis to suspect wrongdoing on the part of Tempur Sealy fiduciaries that would entitle Plaintiff to inspect books and records. Plaintiff has not alleged, much less proven, that Tempur Sealy's directors and officers acted with self-interest as they attempted to renegotiate the Mattress Firm contracts or that they acted in bad faith towards Tempur Sealy

---

[3] Tr. 14. Citations to the Pre-Trial Stipulation and Order are "PTO ¶ #," to the joint exhibits at trial are "JX #" and to the trial transcript are "Tr. #."

stockholders when they implemented their ill-fated negotiating strategy. The most Plaintiff has proven, even under a credible basis standard, is that Tempur Sealy's management, with board oversight, misjudged the strength of its bargaining position with a major customer. If that were enough to trigger inspection rights under Section 220, the printers and copiers of Delaware corporations would be humming day and night to satisfy the curiosities of stockholders who wondered why their fiduciaries had failed to "close the deal," or negotiate a "better deal."

Plaintiff's stated purpose of investigating whether Thompson breached his fiduciary duty by making false disclosures fares no better. The most Plaintiff has proven is that Thompson publicly expressed optimism about the future of the Tempur Sealy/Mattress Firm relationship as late as three months before the relationship was terminated. Beyond the circumstantial temporal relationship between the statements and the termination of the contracts, Plaintiff has offered nothing to suggest even remotely that Thompson did not believe that his prediction regarding the ongoing strength of the Temur Sealy/Mattress Firm relationship was a fair assessment. As factfinder, I am satisfied that Plaintiff's proffered temporal relationship, without more, is insufficient to provide a credible basis to suspect wrongdoing. Accordingly, I decline to compel Tempur Sealy to produce the requested books and records and will enter judgment in its favor.

# I. BACKGROUND

The Court held trial "on a paper record" on November 8, 2018. I have drawn the facts from the stipulations of the parties, exhibits presented during trial and from reasonable inferences that flow from that evidence.[4] Unless otherwise indicated, the following facts were proven by a preponderance of the evidence.

## A. The Parties

Plaintiff, David A. Hoeller, has owned stock in Tempur Sealy (or "the Company") since 2003.[5] Defendant, Tempur Sealy, is a mattress and bedding product manufacturer incorporated in Delaware with its principal place of business in Lexington, Kentucky.[6] Scott L. Thompson is the Company's President, Chief Executive Officer and Chairman of its Board of Directors.[7] Barry Hytinen is its Chief Financial Officer.[8]

---

[4] I note that much of Plaintiff's evidence is in the form of pleadings and other filings in litigation pending against Tempur Sealy in other jurisdictions. Tempur Sealy points out that most of those filings contain nothing more than allegations that can hardly be deemed as factual evidence. Given the summary nature of these proceedings, however, I have considered the litigation filings, and the allegations contained therein, when assessing whether Plaintiff has demonstrated a credible basis to infer wrongdoing.

[5] JX 1–9, JX 25, JX 42, JX 48.

[6] PTO ¶ 1.

[7] PTO ¶ 11.

[8] JX 15, JX 16, JX 19.

**B. Tempur Sealy's Business and Relationship with Mattress Firm**

Tempur Sealy supplies its products to furniture and bedding retailers, department stores and warehouse clubs through its subsidiaries Tempur-Pedic North America, LLC ("Tempur-Pedic") and Sealy Mattress Company ("Sealy").[9] In 2015, the Company's top five customers accounted for 39.4% of net sales, with Mattress Firm and Sleepy's accounting for approximately 24% of overall net sales.[10] Mattress Firm was the Company's largest retail customer by volume in 2015 and 2016.[11]

Tempur Sealy's relationship with Mattress Firm was governed by two Master Retailing Agreements and associated merchandising programs (collectively, the "Agreements").[12] The Agreements authorized Mattress Firm to sell Tempur-Pedic and Sealy products and required Tempur Sealy to distribute bedding products to Mattress Firm's retail stores according to specified schedules.[13]

---

[9] PTO ¶ 2.

[10] JX 10 HOELLER01880; PTO ¶ 5.

[11] PTO ¶ 3.

[12] PTO ¶ 6. The parties to the Agreements were Mattress Firm and the Company's subsidiaries, Tempur-Pedic and Sealy. *Id.*

[13] JX 32 (complaint filed in *Mattress Firm, Inc. v. Tempur-Pedic N. Am., LLC & Sealy Mattress Co.*, No. 2017-22062 (Tex. Dist. Ct., Harris Cty.)) ¶ 11.

On February 5, 2016, Mattress Firm acquired HMK Mattress Holdings, Inc., the holding company for Sleepy's.[14] While Mattress Firm integrated its new acquisition, Tempur Sealy apparently saw an opportunity to renegotiate the Agreements.[15] Viewing the evidence favorably to Plaintiff, it appears that Tempur Sealy took a hard line in negotiations and even went so far as to threaten to cancel the Agreements unless Mattress Firm agreed to incorporate terms more favorable to Tempur Sealy.[16] Mattress Firm acquiesced to Tempur Sealy's "exacting economic conditions and operation restrictions . . . because it needed to keep Tempur Sealy's products on its floors."[17]

In a Form 10-K filed on February 12, 2016, Tempur Sealy disclosed that it had extended its long-term supply agreement with Mattress Firm.[18] In light of Mattress Firm's acquisition of Sleepy's, Tempur Sealy also disclosed that the increased concentration of customers presented risk to the Company and cautioned investors that the loss of one or more of its largest customers could negatively impact

---

[14] PTO ¶¶ 7, 9; JX 89.

[15] JX 32 ¶ 12.

[16] JX 32 ¶ 5.

[17] *Id.*

[18] JX 10 HOELLER01880.

profitability and the Company's stock price.[19] The 10-K notified investors that the Company would be unable to sustain its profitability, service its indebtedness, or make business investments if it did not successfully manage relationships with its largest customers.[20]

On August 8, 2016, Mattress Firm announced it was being acquired by Steinhoff International Holdings N.V. ("Steinhoff"), a European manufacturer that markets and sells its products directly through retail stores and subsidiaries.[21] As a wholly-owned subsidiary of Steinhoff, Mattress Firm gained access to Steinhoff's line of mattresses and bedding products, and thereby secured a supplier that would compete with the Company to stock Mattress Firm's retail stores.[22] Needless to say, with Mattress Firm's newfound leverage, Tempur Sealy found itself in a much more delicate negotiating environment as it continued its efforts to renegotiate the Agreements on more favorable terms.[23]

---

[19] JX 10 HOELLER01888.

[20] *Id.*

[21] PTO ¶ 8; JX 45 (complaint filed in *In re Tempur Sealy Int'l Sec. Litig.*, C.A. No. 1:17-cv-02169-LAK (S.D.N.Y.)) HOELLER01168–72; JX 49, Ex. D (Steinhoff Announcement of Acquisition of Mattress Firm dated Aug. 7, 2016) and Ex. G (Steinhoff Press Release dated Sept. 14, 2016).

[22] PTO ¶ 8; JX 45 ¶¶ 40–42, 47.

[23] JX 45 ¶ 48 (quoting Deutsche Bank report dated Aug. 19, 2016) ("Mattress Firm, via the acquisition of Sleepy's already commands a 25% share of the US mattress market. In FY 15/16 79% of its sales were derived from product supplied by two manufacturers: Tempur Sealy (DBe 52%) and Serta Simmons (27%) . . . We believe Mattress Firm, via

## C. Tempur Sealy's Public Disclosures Regarding Steinhoff's Acquisition of Mattress Firm

Tempur Sealy's public disclosures following Steinhoff's acquisition of Mattress Firm emphasized that the Company's dependence upon a relatively small number of large customers created risk. Indeed, in a Form S-4 Registration Statement and prospectus filed on September 9, 2016,[24] management acknowledged the Company's unease with its customer concentration and even previewed the possibility that its relationships with key customers might dissolve entirely:

> [A]s sales to our large customers grow, our credit exposure to these customers may also increase. Some of these retailers may decide to carry only a limited number of brands of mattress products, which could affect our ability to sell products to them on favorable terms, if at all.[25]

On September 27, 2016, the Company filed a Form 8-K announcing its intention to lower its full-year 2016 financial guidance.[26] While attending a conference hosted by Deutsche Bank that same day, Thompson attributed the

---

its current synergy plans, has likely already sought to exert its enhanced buying power."); JX 45 ¶ 49 (quoting Blueshift Research report dated Oct. 6, 2016) (explaining that Tempur Sealy would face "challenges from multiple fronts, including from . . . potential fallout from Steinhoff's Mattress Firm acquisition" and that the acquisition "creates a possible threat to Tempur's and Sealy's floor and slotting space, and bargaining power, in Mattress Firm stores as Steinhoff could use some of the space for private label mattresses and/or to negotiate lower slotting fees from [Tempur Sealy].").

[24] JX 13.

[25] JX 13 HOELLER03533.

[26] PTO ¶ 10; JX 15.

lowered financial guidance to a decrease in sales to Mattress Firm, which was in the process of rebranding retail stores after the Steinhoff acquisition.[27]  He explained:

> That means a lot of stuff moving around, and they're going to have to work through that.  And while they are working through that, we're going to feel some of that, but I think they'll get through that very rapidly.  And within a quarter or two, we'll be back on what I'll call a normal basis.[28]

Thompson added:

> [Steinhoff's] people are outstanding owners.  They run a decentralized business model, so local management is the same that we've been working with for a decade.  They are fully empowered and we don't see much change from that standpoint.[29]

All told, Thompson was "very optimistic long-term, but as [Mattress Firm] work[s] through rebranding some of their stores, we are going to feel that."[30]

On October 27, 2016, the Company filed another Form 8-K to announce earnings for the third quarter of 2016.[31]  Thompson held an earnings call that day and echoed the explanation provided at the Deutsche Bank conference, attributing the Company's declining sales to Mattress Firm's post-acquisition transition.[32]  He

---

[27] PTO ¶ 11; JX 47 HOELLER03203.

[28] JX 47.

[29] JX 47 HOELLER03204.

[30] JX 47 HOELLER03202.

[31] JX 16.

[32] JX 17 HOELLER03078.

advised that sales would be similarly impacted for the following quarter but noted that the Company "expect[ed] this transition of stores to be very successful."[33] Touting the Company's expectation of success, Thompson told analysts, "We are encouraged by the improved Tempur Sealy sales trends in the markets that have already undergone significant rebranding, and are thrilled to help where we can in this significant transition."[34] He also noted that the Company enjoyed working with Steinhoff prior to its acquisition of Mattress Firm and mused that he was "wildly optimistic about the future for both the Mattress Firm team and Tempur Sealy."[35]

On November 4, 2016, the Company filed a Form 10-Q for the quarterly period ending on September 30, 2016.[36] Again, the Company explained the risks associated with Mattress Firm's acquisition of Sleepy's, reported the declining sales to Mattress Firm in the third quarter and predicted that sales would continue to decline in the fourth quarter of 2016.[37]

---

[33] *Id.*

[34] *Id.*

[35] JX 17 HOELLER03082.

[36] JX 18.

[37] *Id.*

## D. The Parties Are Unable to Negotiate a New Contract

In January 2017, Tempur Sealy representatives attended the Las Vegas Market, a bedding and furniture industry convention.[38] Tempur Sealy and Mattress Firm representatives planned to meet several times during the convention, including at a meeting suggested by Mattress Firm's Chief Strategy Officer to discuss "future growth drives" with Tempur Sealy's Executive Vice President and President of North America.[39] Rather than discuss future initiatives at this meeting, however, Mattress Firm advised Tempur Sealy that it would terminate the Agreements and no longer sell Tempur Sealy products unless Tempur Sealy agreed to different terms presumably more favorable to Mattress Firm.[40] In the following days, Mattress Firm allegedly "proposed terms that struck a greater economic balance between the parties but nonetheless were still more favorable for Tempur Sealy than Mattress Firm," but "Tempur Sealy was unwilling to compromise its rigid commercial position."[41]

---

[38] JX 79, Ex. A (Email chain between Richard Anderson, Executive Vice President and President of North America for Tempur Sealy, and Craig McAndrews, Chief Strategy Officer of Mattress Firm).

[39] JX 79, Ex. B (Tempur Sealy schedule of meetings planned for the Las Vegas convention); JX 79, Ex. A.; JX 119 (Hoeller Dep. Tr.) at 92:3–19 (admitting he had no reason to believe it was untrue that the email chain was "about Mattress Firm and Tempur Sealy setting up yet another meeting at the Las Vegas show in January 2017 for the purpose of their executives discussing . . . 'the future growth drivers at [Tempur].'").

[40] PTO ¶ 16; JX 79, Ex. C (Tempur Sealy meeting minutes dated Jan. 23, 2017); JX 32 ¶ 3.

[41] JX 32 ¶ 16.

On January 27, 2017, ahead of the contractually required thirty days' notice, Sealy and Tempur-Pedic informed Mattress Firm that they were terminating the Agreements immediately, would send no further products and would stop delivery of products that had already been shipped.[42] Three days later, the parties executed letter agreements providing that Tempur-Pedic and Sealy would continue to perform under the Agreements through April 3, 2017.[43] On that same day, the Company disclosed to investors that it had issued formal termination notices for all brands supplied to Mattress Firm, and the Company's stock fell roughly 32%.[44]

### E. State and Federal Litigation Follow

Even though it appeared the parties had agreed to an orderly wind-down process, Mattress Firm and Tempur Sealy soon found themselves embroiled in litigation. On March 30, 2017, Mattress Firm filed an action in Texas state court against the Company's subsidiaries as direct parties to the Agreements (the "Texas Action").[45] Its initial petition sought damages for breach of the letter agreements between the parties governing the wind-down, tortious interference and a declaratory judgment that Mattress Firm can use Tempur-Pedic and Sealy's intellectual property

---

[42] JX 32 ¶ 17.

[43] JX 32 ¶ 19.

[44] JX 45 ¶ 7; JX 32 at 1.

[45] JX 32.

for the sale of remaining inventory.[46]  All of Mattress Firm's allegations related to Tempur Sealy's "systematic campaign aimed at exacting retribution for their losses" during the wind-down of the relationship.[47]  The case was set to begin trial in September 2018, but Mattress Firm filed an amended petition and Tempur Sealy requested a 120-day continuance, which the court granted.[48]

On April 7, 2017, Tempur Sealy, through its subsidiaries, sued Mattress Firm in Texas federal court for breach of contract and trademark infringement (the "Federal Action").[49]  Tempur Sealy simultaneously sought a temporary restraining order and preliminary injunction preventing Mattress Firm from continuing to use the Company's intellectual property in advertising in violation of the Agreements.[50] The court denied the requested TRO and the parties reached an agreement that, as of May 8, 2017, Mattress Firm was no longer a Tempur-Sealy retailer.[51]  Less than two weeks later, on May 16, 2017, Tempur Sealy filed a motion for preliminary injunction in which it argued that Mattress Firm was confusing customers by the use

---

[46] *Id.*

[47] JX 32 at 2.

[48] JX 135, JX 124.

[49] JX 43 (complaint filed in *Tempur-Pedic N. Am., LLC, et al. v. Mattress Firm, Inc.*, No. 17-10668 (S.D. Tex.)).

[50] JX 39 HOELLER00702.

[51] JX 34, JX 39 HOELLER00703.

of Tempur-Sealy trademarks on the Mattress Firm website.[52] The court granted Tempur Sealy's motion in part, ordering Mattress Firm to make clear to customers that it was not an authorized reseller of Tempur-Pedic products.[53] Subsequently, the court granted partial summary judgment in favor of Mattress Firm on Tempur Sealy's claim of false internet advertising and request for damages beyond Tempur-Pedic's lost profits.[54]

On August 7, 2017, the Oklahoma Police Pension and Retirement System filed a consolidated class action in the United States District Court for the Southern District of New York alleging that Tempur Sealy, Thompson and Hytinen violated Section 10(b) of the Exchange Act and Rule 10b-5 (the "Securities Action").[55] Informed by the Texas Action petition and comments from confidential witnesses of Mattress Firm and Tempur Sealy, the complaint in the Securities Action alleges that Tempur Sealy "failed to disclose the material risk that Company [sic] would ultimately terminate its contracts with Mattress Firm as a result of the terms Mattress

---

[52] JX 39 HOELLER00703.

[53] JX 39 HOELLER00725.

[54] JX 94, JX 64.

[55] JX 45.

Firm was capable of demanding after it was acquired, given that Mattress Firm now had a vertically integrated parent company on which to fall back."[56]

## F. Plaintiff Makes His Section 220 Demand

On October 13, 2017, Hoeller served a books and records demand on Tempur Sealy seeking inspection of seven categories of documents dating from January 1, 2016 through the present.[57] The demand states that Plaintiff seeks to "investigate

---

[56] JX 45 HOELLER01172. The confidential witnesses included a former Human Resources Manager at Tempur Sealy and a former Inside Sales Manager at Mattress Firm. The former HR Manager reported that Tempur Sealy's Human Resources Department told managers to hold off on hiring in mid to late November and early December 2016 (after Thompson's public statements) because of "uncertainties" regarding the Company's negotiations with Mattress Firm. JX 45 HOELLER01170–71. The former IS Manager reported that the Vice President of Multi-Channel Sales told him in August 2016 that negotiations with Tempur Sealy were not going well and that the contracts may be cancelled due to hard lines being taken by both parties. *Id*.

[57] JX 51. The seven categories are: "1. All minutes and notes of any meetings of the Board, or any Committee thereof, including, but not limited to the Audit Committee, during which any of the following topics was discussed: a. the Company's (including any and all of its subsidiaries) relationship with Mattress Firm (including any and all of its subsidiaries or affiliates); b. the Company's (including any and all of its subsidiaries) relationship with Sleepy's (including any and all of its subsidiaries or affiliates); c. the Company's (including any and all of its subsidiaries) relationship with Steinhoff (including any and all of its subsidiaries or affiliates); d. the underlying factual allegations of the Texas State Action; e. the underlying factual allegations of the Texas Federal Action; f. the underlying factual allegations of the Securities Class Action; and g. the Company's public disclosures to stockholders, including SEC filings, press releases, and/or public statements made during investor conference calls and/or presentations relating to the events, circumstances, and transactions described above. 2. All agendas and/or packages prepared in advance of and/or documents provided to the Board or Committee members in conjunction with any meeting referred to in the previous request and circulated to any expected participant thereof, including any reports or documents enclosed with such agendas. 3. All communications between Tempur Sealy (including any and all of its subsidiaries) and Mattress Firm (including any and all of its subsidiaries or affiliates) discussed, referenced, excerpted from, and/or introduced as exhibits in pleadings filed in the Texas State Action

16

potential wrongdoing, distribution of false and misleading information, and/or breaches of fiduciary duties by the members of the Board, Tempur Sealy's current and/or former executive officers, and/or others" in connection with the termination of the Company's contracts with Mattress Firm and the ensuing litigation.[58] The demand then states that Plaintiff will use the fruits of the inspection to "support appropriate action including, but not limited to a stockholder derivative action or litigation demand" and "to evaluate and determine [the disinterestedness of the current board members] such that demand upon the board to bring a derivative action on behalf of the Company would be futile."[59]

The Company rejected Plaintiff's demand on November 1, 2017, because the demand failed to articulate a credible basis to suspect wrongdoing by the Company's

---

and Texas Federal Action, including, but not limited to, the Texas State Action Complaint and the Texas Federal Action Complaint. 4. All internal corporate governance documents not currently accessible to stockholders via the Company's investor relations website. 5. All documents pertaining to the independence of the members of the Board, including, but not limited to, any annual questionnaires and/or documents discussing, describing, concerning, or constituting the determination of director independence pursuant to the pertinent rules of the New York Stock Exchange. 6. All documents sufficient to show any and all personal, familial, financial, or business relationships between or among any current director or officer of the Company and/or with Hytinen, other than their service as directors of the Company. 7. Any documents that have already been produced or that the Company is planning or intending to produce to any other stockholders making similar demands for inspection of books and records under Section 220 or any analogous statute." JX 51 HOELLER00006–07.

[58] JX 51 HOELLER00008.

[59] *Id*.

directors and officers and sought inspection of an impermissibly broad scope of documents.[60] On March 13, 2017, after several rounds of correspondence and the execution of a confidentiality agreement, the Company made a limited production of documents that it maintained demonstrated Plaintiff's suspicions were unfounded.[61] Specifically, the Company produced four documents dating from January 16 through January 27, 2016—an email chain between Mattress Firm's Chief Strategy Officer and Tempur Sealy's Executive Vice President and President of North America, a list of the Company's scheduled meetings with Mattress Firm during the Las Vegas convention, and minutes from the Company's board meetings held on January 23, 2017 and January 26, 2017.[62] The Company asserted that these documents clearly reflected that going into the Las Vegas convention, both parties appeared to be planning for an ongoing relationship and that no one at Tempur Sealy expected Mattress Firm to terminate the Agreements. The Company's transmittal letter warned of sanctions if Plaintiff moved forward with his demand.[63] Plaintiff objected to the limited production by letter dated March 27, 2018, and attempted to

---

[60] JX 53.

[61] JX 58, JX 59, JX 61, JX 63, JX 79.

[62] JX 79, Exs. A–D.

[63] JX 79 HOELLER00162.

schedule a call to discuss a broader production.[64] The Company rejected that overture on April 4, 2018, and informed Hoeller that no further documents would be produced.[65] Plaintiff filed his Verified Complaint on May 10, 2018.[66]

## II. ANALYSIS

Section 220 permits a stockholder of a Delaware corporation to inspect the corporation's books and records if the stockholder's demand complies with the statute's form and manner requirements and states a proper purpose.[67] The Company does not contest that Hoeller's demand meets the statute as to form and manner. [68] Instead, the Company disputes whether Hoeller has stated a proper purpose by demonstrating a credible basis from which the Court may infer that the Company's directors or officers breached their fiduciary duties. The Company also maintains that, even if Plaintiff has stated a proper purpose for inspection, his demand for documents is too broad. For reasons explained below, I agree that Plaintiff has not proven a proper purpose for inspection. Accordingly, I need not reach the Company's argument that the demand is overbroad.

---

[64] JX 80–83, JX 137.

[65] JX 84.

[66] JX 87 (Pl.'s Verified Compl.).

[67] 8 *Del. C.* 220(c).

[68] PTO ¶ 8. Nor does Defendant contest Hoeller's continuous ownership of Tempur Sealy stock. *Id.*

## A. The Section 220 Standard

A "proper purpose" for inspection is one that is "reasonably related to [the plaintiff's] interest as a stockholder."[69] Although "[t]he desire to investigate mismanagement or wrongdoing is a proper purpose,"[70] the stockholder "must do more than state, in a conclusory manner," that this is his purpose.[71] The stockholder must *prove* the purpose by a preponderance of the evidence.[72] To meet this burden, the stockholder must present a credible basis from which the court can infer that the alleged wrongdoing occurred.[73] As the lowest standard of proof known in our law, "credible basis" requires that the plaintiff demonstrate only "some evidence" of wrongdoing, not that wrongdoing "actually occur[ed]."[74]

The stockholder must also state the reason(s) he seeks to inspect the corporation's books and records, "i.e., what [the plaintiff] will do with the

---

[69] 8 *Del. C.* § 220(b).

[70] *Lavin v. W. Corp.*, 2017 WL 6728702, at *7 (Del. Ch. Dec. 29, 2017).

[71] *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 646 (Del. Ch. 2006). "Delaware law does not permit section 220 actions based on an ephemeral purpose, nor will this court impute a purpose absent the plaintiff stating one." *Id.*

[72] *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *8 (Del. Ch. Jan. 15, 2019).

[73] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006).

[74] *Id.* at 118.

information or an end to which that investigation will lead."[75]  "Investigations of meritorious allegations of possible mismanagement, waste or wrongdoing, benefit the corporation, but investigations that are 'indiscriminate fishing expeditions' do not."[76] Thus, in the absence of evidence of a fiduciary duty breach, the investigation of a decision that falls squarely within the business judgment rule cannot be a proper purpose as it provides no claim against corporate fiduciaries for the stockholder to pursue (i.e., no "end" to the investigation).[77]

## B. The Evidence Reveals No Credible Basis to Infer Wrongdoing

Plaintiff alleges three theories of wrongdoing on the part of Tempur Sealy's directors, officers and unspecified "others":  (i) "allowing or causing the Company to breach its contracts with [Mattress Firm]"; (ii) "allowing or causing the Company

---

[75] *W. Coast Mgmt.*, 914 A.2d at 646.

[76] *Seinfeld*, 909 A.2d at 122 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 571 (Del. 1997)); *see also La. Mun. Empls.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *3 (Del. Ch. Oct. 5, 2012) ("To permit stockholders to demand corporate books and records based on mere suspicion of wrongdoing would invite mischief and expose companies to indiscriminate fishing expeditions.") (internal quotation marks omitted).

[77] *See Seinfeld*, 909 A.2d at 120 (affirming Chancery Court's finding "that a disagreement with the business judgment of Verizon's board of directors or its compensation committee is not evidence of wrongdoing and did not satisfy [plaintiff's] burden under section 220"); *Marathon P'rs L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *4 (Del. Ch. July 30, 2004) ("Stockholders cannot satisfy [the credible basis] burden merely by expressing disagreement with a business decision.  When a business judgment forms the basis of a request for books and records, a stockholder must show a credible basis for an inference that management suffered from some self-interest or failed to exercise due care in a particular decision.") (footnotes omitted); *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2004 WL 1945546, at *5 (Del. Ch. Aug. 30, 2004) (same).

to ruin its relationship with its most important customer"; and (iii) "allowing or causing the Company to make false and misleading statements to the investing public related to the fact that the Company's relationship with its key client, Mattress Firm, had soured, and was at significant risk of termination."[78] I address each theory in turn below.

## 1. The Investigation of Mismanagement and Breach of Contract

Plaintiff contends that mismanagement of Tempur Sealy's relationship with Mattress Firm led to the loss of its largest customer and potential liability following Mattress Firm's initiation of the Texas Action. When pressed at trial to state more

---

[78] JX 87 ¶ 1. I acknowledge Tempur Sealy's argument that Hoeller himself appears to have no specific understanding of why he is seeking documents from the Company. Indeed, during his deposition, Hoeller could not point to any specific wrongdoing that supported his demand. *See* JX 119 at 28:7–9 (confirming that he "speculate[s] that what was in [Tempur Sealy's press release announcing the termination of Mattress Firm] isn't true."); 37:6–12 (admitting that "the entirety of [his] basis for suspecting wrongdoing prior to [retaining] counsel was the content of the press release . . . and the fact that a complaint was filed against Tempur Sealy and certain of its officers."); 66:2–20 ("Q: And as you sit here today, you don't have facts to support the assertion in this letter that by September 2016 the relationship between Tempur Sealy and Mattress Firm, quote, 'had already deteriorated and was very likely to be terminated,' close quote. Is that correct? A: Correct."); 125:22–126:5 (admitting he was unaware of "any facts inconsistent with what the[] board minutes state," namely that "Mattress Firm had unexpectedly stated it was terminating the relationship with the company for philosophical and business model differences."). Courts have found that a stockholder's failure to identify facts suggesting wrongdoing is sufficient to establish that a stockholder's demand "was made merely on the basis of suspicion or curiosity." *Seinfeld*, 909 A.2d at 120; *see also Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, at *1 (Del. Ch. Nov. 13, 2017) (denying inspection upon finding that plaintiff's purposes belonged to his retained law firm). Nevertheless, I will rely on the arguments made by counsel in their pre-trial briefs and at trial to assess the validity of Plaintiff's demand.

specifically Plaintiff's theory of mismanagement, Plaintiff's counsel suggested that Tempur Sealy's efforts to renegotiate the Agreements and its subsequent breach of the post-termination letter agreements may implicate a breach of the board's duty of oversight.[79] When a stockholder's purpose is premised on the board's possible breach of its duty of oversight (i.e., a *Caremark* claim),[80] the stockholder "must provide some evidence from which the Court may infer that the board utterly failed to implement a reporting system or ignored red flags."[81]

Plaintiff has failed to proffer even a scintilla of evidence to support a credible basis that a *Caremark* claim may exist in these facts. His narrative is that management and the board actively mismanaged the negotiations with Mattress Firm. Nothing in this narrative (or in Plaintiff's proffered evidence) suggests that the board failed to oversee management or ignored red flags of trouble. Indeed, in

---

[79] Tr. 13, 19. Plaintiff made no mention of a *Caremark* claim in his demand, complaint or pre-trial briefing. When counsel introduced the *Caremark* theory at trial, he was unable to point to any evidence to support it. *Id.* Nevertheless, even though Defendant was not placed on notice of the claim, I consider it here for the sake of completeness.

[80] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[81] *Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.*, 2016 WL 4548101, at *5 (Del. Ch. Aug. 31, 2016) (denying inspection); *see also City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 51 (Del. 2017) (explaining that a showing of director's bad faith and actual or constructive knowledge of legally improper conduct are necessary conditions to director oversight liability and providing, as examples of bad faith, intentional dereliction of duty and conscious disregard for responsibilities).

the Texas Action petition, which Plaintiff presents as evidence of wrongdoing, Mattress Firm described the parties' negotiating history as follows:

> Over the years, Tempur Sealy gradually imposed more and more exacting economic conditions and operations restrictions on Mattress Firm, and Mattress Firm had little choice but to accept those requirements because it needed to keep Tempur Sealy's products on its floors. From the beginning of 2016—strategically timed to threaten crucial events in Mattress Firm's business—Tempur Sealy threatened to cancel the existing agreements unless Mattress Firm agreed to revise or renegotiate their existing deal to incorporate economic terms that were increasingly favorable to Tempur Sealy. Mattress Firm acquiesced to several of these demands, but Tempur Sealy continued to push for more. By the beginning of 2017, the parties had reached an impasse. On January 23, 2017, representatives of Mattress Firm met with representatives of Sealy and Tempur-Pedic and informed them that, due to the evolving nature of the mattress business and Defendants' unwillingness to accept reasonable economic terms, Mattress Firm had decided to end its relationship with Sealy and Tempur-pedic [.][82]

Plaintiff takes issue with the Company's "hard-ball negotiating tactics,"[83] but the Steinhoff acquisition, which occurred six months before Mattress Firm ended its relationship with the Company, empowered Mattress Firm to flip the script and take advantage of the Company's vulnerability. The Texas Action petition suggests both parties ultimately took firm stances in their negotiations and could not reach a compromise. The fact that active negotiations failed to lead to a deal does not

---

[82] JX 32 ¶ 12–13.

[83] Pl.'s Amended Opening Pre-Trial Br. ("POB") 33 (D.I. 48).

24

support a *Caremark* claim, particularly given the evidence that Tempur Sealy's board was apprised of and, at times, involved in the negotiations.[84]

Plaintiff also failed to present any evidence even remotely suggesting that Tempur Sealy fiduciaries were motivated by self-interest in their negotiations with Mattress Firm or in any of the conduct that gave rise to Mattress Firm's allegations of post-termination breach of contract. Plaintiff's demand seeks information regarding board interest or conflicts and yet nothing he has presented by way of evidence (or argument) provides a credible basis to suspect that Tempur Sealy fiduciaries were conflicted with respect to the Company's dealings with Mattress Firm, Sleepy's or Steinhoff.

Having failed to present any credible basis to suspect a breach of the duty of loyalty, by evidence of either bad faith or conflicted behavior, Plaintiff is left to articulate some credible basis to believe that Tempur Sealy fiduciaries breached their duty of care. Curiously, neither party has mentioned, much less addressed, the fact that Tempur Sealy's certificate of incorporation contains an exculpatory provision immunizing the Company's directors from monetary liability for breach of the duty of care as permitted by Section 102(b)(7) of the DGCL.[85] When a stockholder seeks

---

[84] PTO ¶ 11; JX 10 HOELLER01880; JX 79, Exs. C and D.

[85] Tempur Sealy Certificate of Incorporation, Article VI ("Limitation of Liability"), http://investor.tempursealy.com/corporate-governance.

to use Section 220 to investigate corporate wrongdoing by company directors, he "has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing."[86] In other words, Plaintiff cannot state as his proper purpose a desire to investigate board level breaches of the duty of care in aid of a direct or derivative claim for money damages. Although the exculpatory provision does not impede his purpose to investigate management-level breaches of the duty of care,[87] the real problem with Plaintiff's case for a due care violation (by either directors or officers) runs deeper than a statutory road block. There is simply no evidence to support it.

"Disagreement with a business decision, in the absence of evidence from which the Court may infer a possible breach of fiduciary duty, does not create a credible basis from which the Court can infer mismanagement."[88] When a business decision or strategy forms the basis of a Section 220 demand, and the stockholder proffers as his purpose for inspection a desire to investigate a possible breach of the duty of care, he must present some credible basis to suspect that the corporation's

---

[86] *Se. Pa. Transp. Auth.*, 2015 WL 1753033, at *13.

[87] *Id*. at *13 n.108.

[88] *Marathon P'rs*, 2004 WL 1728604, at *7 n.40.

26

fiduciaries acted with gross negligence.[89]  And a poorly formulated or executed

negotiation strategy, without more, does not a gross negligence claim make.[90]

The dueling breach of contract suits initiated by Tempur Sealy and Mattress

Firm following the termination of their relationship do not supply the "more" that

---

[89] *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651–52 (Del. Ch. 2008) ("Unless judges are mindful of the substantial difference between a simple negligence and gross negligence standard, the policy purpose served by Delaware's choice of a gross negligence standard [to define a breach of the fiduciary duty of care] risks being undermined.  The definition of gross negligence used in our corporate law jurisprudence is extremely stringent.") (footnotes omitted); *id.* at 652 n.45 ("Gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.") (citation omitted).

[90] *See Marathon P'rs*, 2004 WL 1728604, at *4; *see also Blackmore P'rs, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *8 (Del. Ch. Oct. 14, 2005), *abrogated on other grounds by Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A.3d 535, 561 (Del. Ch. 2015) ("[T]he choices made in formulating a negotiating strategy are within the core of what is protected by the business judgment rule."); *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 2009 WL 3086537, at *7 (Del. Ch. Sept. 28, 2009) ("Failed negotiations, without more, do not form a credible basis supporting an inference of wrongdoing.").  I acknowledge Plaintiff's evidence that failed efforts to renegotiate the Agreements and the subsequent termination of the Mattress Firm relationship were harmful to Tempur Sealy.  *See, e.g.*, JX 32 at 1–2 (providing titles of financial news coverage after the breakup was announced including "*Tempur Sealy's stock rocked after Mattress Firm contracts are terminated: Mattress maker shares suffer biggest one-day selloff in nine years*, MARKET WATCH, Jan. 31, 2017" and "*Is Tempur Sealy's Nightmare Just Beginning?*, YAHOO! FINANCE, Jan. 31, 2017.").  But harm alone does not provide a credible basis to suspect wrongdoing.  When a stockholder intends to pursue litigation with the results of his inspection, the stockholder's purpose does not relate to his interests as a stockholder unless the alleged harm is the product of wrongdoing that the stockholder can seek to remedy on behalf of the company or the stockholders.  *See, e.g.*, *Lennar Corp.*, 2012 WL 4760881, at *2 ("[I]f a stockholder seeks to use Section 220 to investigate corporate wrongdoing for which there is no remedy, then the stockholder has not stated a proper purpose."); *Polygon Global Opportunities Master Fund v. W. Corp.*, 2006 WL 2947486, at *5 (Del. Ch. Oct. 12, 2006) (rejecting purpose as unrelated to stockholder interests where plaintiff would not have standing to pursue a derivative action based on potential breaches or a direct action based on entire fairness).

Plaintiff needs to demonstrate a credible basis that a breach of fiduciary duty may have occurred.[91] In this regard, Plaintiff argues that the facts here are nearly identical to those considered in *Elow v. Express Scripts*, where the court entered a judgment allowing a stockholder to inspect books and records following Express Scripts's breach of a material contract.[92] For reasons explained below, *Express Scripts* provides no grounds to compel inspection here.

---

[91] I note that, during trial, Plaintiff's counsel suggested that Plaintiff might use the fruits of inspection to initiate a proxy contest to replace the Tempur Sealy board. *See* Tr. 10, 13. Neither the demand nor Plaintiff's Section 220 complaint make any reference to a possible proxy contest. Nevertheless, because Plaintiff's demand states that he seeks documents "to support appropriate action including but not limited to filing a derivative action," I will not rule out that Plaintiff may seek inspection in furtherance of a possible proxy fight. *See Norfolk Cty. Ret. Sys.*, 2009 WL 353746, at *11 (noting that plaintiff's demand failed to state plaintiff's intention to engage in a proxy contest but allowing an inference of this alternate purpose because plaintiff's demand stated that it would take "appropriate action" if it concluded that defendants breached their fiduciary duties); *Graulich v. Dell Inc.*, 2011 WL 1843813, at *7 (Del. Ch. May 16, 2011) (finding that where plaintiff did not include "any other appropriate action" in his demand letter, "the only purpose that c[ould] be fairly read" was plaintiff's expressed purpose to file a derivative suit). Even giving Plaintiff the benefit of this doubt, he has failed to articulate any reason why he would need the wide range of books and records he identifies in his demand to initiate a proxy contest based on the Company's failure to retain Mattress Firm or the subsequent breach of contract litigation between those parties. The loss of Mattress Firm and resulting litigation is already well known to Tempur Sealy stockholders, and the pleadings and other filings in the Texas Action and Federal Action speak for themselves. *Cf. Polygon Global*, 2006 WL 2947486, at *4 (rejecting stockholder's desire to investigate books and records to inform decision to seek appraisal where the company appeared to have disclosed all material information necessary to make that determination).

[92] Tr. 17–18; *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151 (Del. Ch. May 31, 2017).

28

At first glance, the cases appear quite similar. Express Scripts and one of its largest clients, Anthem, entered a ten-year contract requiring Express Scripts to provide services to Anthem and permitting a "periodic pricing review procedure" whereby the parties agreed to negotiate in good faith over new pricing terms.[93] Midway through the second periodic pricing review, a senior vice president of Express Scripts stated on an investor call that the company "had a great relationship with Anthem . . . the relationship is very, very solid," and then confirmed that he expected the relationship to last through the next four years.[94] A few months later, Express Scripts's president spoke of continued "close collaboration" with clients and stated that "performance to date and the positive feedback we continue to receive gives us confidence that we will have strong retention across the board."[95] Three months later, the president reiterated on an earnings call that the company's "strong client relationship positions us well for 2016" and, "based on our results this year, we are confident about next year's selling and retention season."[96]

About five months later, however, Anthem initiated litigation alleging that Express Scripts had acted in bad faith and materially breached the parties' governing

---

[93] *Express Scripts*, 2017 WL 2352151, at *1–2.

[94] *Id.* at *2.

[95] *Id.*

[96] *Id.*

contract by, among other things, "(1) delaying the repricing process for months; (2) refusing to negotiate over Anthem's pricing proposals; (3) repudiating its contractual obligations to reprice the contract to ensure Anthem's receipt of competitive benchmark pricing; and (4) failing to offer anything remotely close to competitive benchmark pricing as required."[97]  The complaint revealed that Anthem had twice provided Express Scripts with notices "detailing numerous operational breaches of the Agreements" and "had threatened to terminate the agreement if the breaches were not cured."[98]  The first notice of breach came on February 16, 2015, just nine days before the investor call where Express Scripts's president described the relationship as "very, very solid"; the second notice came on April 1, 2015, roughly four months before the president touted "the positive feedback [Express Scripts] continue[s] to receive" from its major customers, including Anthem. Express Scripts admitted receiving the notices of breach in its answer to the complaint and counterclaims.[99]

A securities class action followed the breach of contract action.  In that complaint, plaintiffs alleged that Express Scripts told investors the relationship with

---

[97] *Id.* (quotation marks omitted).

[98] *Id.* at *6.

[99] *Id.* at *2.

Anthem was strong even though it had received two formal notices of breach and knew that the negotiations had damaged the parties' relationship.[100]

After considering this evidence, the *Express Scripts* court granted Elow's demand to inspect books and records to determine whether Express Scripts's

> officers and directors breached their fiduciary duties by (1) allowing [Express Scripts] to breach its contractual obligations to Anthem to engage in good faith pricing negotiations; (2) failing to prevent [Express Scripts's] breaches despite a known duty to act in the face of knowledge about the issues with Anthem; and (3) communicating dishonestly with stockholders regarding the Anthem contract and customer retention.[101]

Here, as in *Express Scripts*, the Company's largest customer terminated its contract after management made public, positive statements about the relationship. And, as in *Express Scripts*, a breach of contract and securities class action have followed, and a Tempur Sealy stockholder has requested books and records to investigate the events giving rise to that litigation. But the similarities end there. The pleadings submitted as evidence in *Express Scripts* showed that Anthem terminated its contract because Express Scripts's management refused to negotiate in good faith even after being placed on notice of Express Scripts's breaches and after being given several opportunities to cure the breaches. The board's bad faith

---

[100] *Id*. at *3.

[101] *Id*. at *5.

and breach of contract were supported by Express Scripts's own admissions that the relationship with Anthem was deteriorating even as Express Scripts's fiduciaries represented to the market that the relationship was strong.[102] The court could infer from that evidence a credible basis to suspect both possible *Caremark* violations and clear disclosure violations (the company had admitted in verified pleadings that Anthem had provided several notices of breach prior to the president's rosy statements).[103] Importantly, the *Express Scripts* court did not allow inspection based on bare allegations that the company had lost a major customer or had been sued for breach of contract by that customer.

The pleadings from the Texas Action and Federal Action on which Plaintiff relies to support his demand for inspection address breaches of contract arising from behavior that occurred after Mattress Firm terminated the Agreements. The Texas Action petition focuses almost entirely on breaches of the letter agreements governing the wind-down and does not address Mattress Firm's termination of the Agreements apart from a brief description in the background facts.[104] The Federal

---

[102] *Id.* at *6.

[103] *Id.*

[104] Mattress Firm's summary of its history with Tempur Sealy is not especially bitter: "For many years, Mattress Firm and Defendants ("Tempur Sealy") enjoyed a long-term, mutually beneficial relationship. But in January of [2017], the renegotiation of their contracts did not go well, and as a result of those failed negotiations, Tempur Sealy lost its largest retailer." JX 32 at 1.

Action concerns Mattress Firm's continued use of the Company's intellectual property after termination. None of the filings in either of these actions indicates that the Company breached a fiduciary duty. Whereas Elow demonstrated a credible basis to infer a *Caremark* violation, Hoeller has alleged only that as the Tempur Sealy management attempted to renegotiate more favorable contracts, their negotiating strategy led Mattress Firm to terminate the Agreements. There is no hint that the Company negotiated in bad faith or failed to cure after being placed on notice that it was in breach of the Agreements.[105]

Beyond the legal and factual flaws, the untenable practical implications of Plaintiff's arguments reveal the fallacy of his logic. The credible basis standard would be turned on its head if a stockholder was afforded inspection rights every time a company in which he owned stock lost a major customer or was sued for breach of contract. Customers, even major customers, come and go in business. The mere fact of departure says nothing of corporate wrongdoing. As for breach of contract litigation, there is no principled basis to determine which alleged breaches of contract, of the many a company might defend in its lifetime, would justify a

---

[105] This is not to say that the mere fact of litigation, or even evidence that Tempur Sealy allegedly negotiated with Mattress Firm in bad faith, would be sufficient to provide a credible basis to infer wrongdoing that would justify stockholder inspection under Section 220. *See, e.g.*, *Graulich*, 2011 WL 1843813, at *5 n.49 ("[S]imply saying that the company has already been subject to lawsuits, with nothing else, does not cut it.").

33

stockholder's investigation when all the stockholder offers by way of evidence of corporate wrongdoing are the allegations of breach themselves. How would the court determine which breaches are sufficiently "material" to permit inspection (assuming materiality alone would be the touchstone for inspection—a proposition that finds no support in our law)? And how could the court ensure that it is "maintaining a proper balance between the rights of stockholders to obtain information based upon credible allegations of corporate wrongdoing and the rights of directors to manage the business of the corporation without undue interference from stockholders," when any third party allegation of breach of contract signals the green light for stockholder inspection of books and records?[106] Of course, Plaintiff has not even acknowledged these questions much less endeavored to provide answers.

## 2. The Investigation of False or Misleading Statements

Against the backdrop of the same facts—the Company's hard-ball negotiations, Mattress Firm's termination of the Agreements and the subsequent litigation—Plaintiff asks the Court to infer that "members of the Board, Tempur Sealy's current and/or former executive officers, and/or others" distributed false or misleading information through SEC filings and discussions with analysts when they

---

[106] *Seinfeld*, 909 A.2d at 118.

touted the strength of the Tempur Sealy/Mattress Firm relationship.[107] Plaintiff is correct that when fiduciaries communicate with stockholders about corporate matters they must do so fully and accurately to comply with their fiduciary duties.[108] When a stockholder alleges that a fiduciary disclosed false information in a scenario where neither stockholder action nor approval is solicited, the stockholder must demonstrate that the fiduciary "knowingly disseminated false information."[109]

At trial, the only affirmative statements Plaintiff characterized as false or misleading were Thompson's statements at various public appearances and investor calls where he expressed his view that Tempur Sealy and Mattress Firm would successfully work through the transition issues following Steinhoff's acquisition of Mattress Firm.[110] But Plaintiff offered no evidence that would even hint that

---

[107] JX 51.

[108] *See Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.").

[109] *See id.* at 9. The scienter requirement implicit in this standard is not "inadvertent and represented an effort on [the Supreme Court's] part to ensure that our law was not discordant with federal standards and that our law did not encourage a proliferation of disclosure claims outside the discretionary vote or tender context by exposing corporate directors to an additional host of disclosure claims that did not involve the need to show reliance or scienter." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157–58 (Del. Ch. 2004).

[110] Tr. 16, 29, 35, 37. Hoeller specifically points to Thompson's comments during the Deutsche Bank Leveraged Finance Conference on September 27, 2016 and an earnings call

Thompson knew his statements were false when made. Moreover, Thompson's invariably off-handed statements are clearly not deliberative statements issued by the Company to apprise stockholders of the state of the Company's business. The statements contain no representations of fact; they are, instead, quintessential expressions of opinions about the future. That Thompson did not prove to be an

---

on October 27, 2016. *See* POB 38 (citing JX 17 and JX 47). Hytinen, Tempur Sealy's CFO, also participated in the October 27 earnings call and is a named defendant in the Securities Action, but Plaintiff does not directly address Hytinen or his comments except for a reference in the sixth category of requested documents, aimed at determining the independence of Tempur Sealy's officers and directors. The challenged statements from the conference include: "That means a lot of stuff moving around, and they're going to have to work through that. And while they are working through that, we're going to feel some of that, but I think they'll get through that very rapidly. And within a quarter or two, we'll *be back on what I'll call normal basis.*" POB 11 (citing JX 47); "Also, our largest client, our largest customer, recently got purchased. They are going through some transitions and we are feeling some of that transition. *We are very optimistic long-term*, but as they work through rebranding some of their stores, we are going to feel that." *Id.*; "From an ownership standpoint, look, [Steinhoff's] people are outstanding owners. They run a decentralized business model, so local management is the same that we've been working with for a decade. *They are fully empowered and we don't see much change from that standpoint*." *Id.* 11–12 (citing JX 47) (all emphasis supplied by Plaintiff). The challenged statements from the earnings call include: "[W]e experienced some significant weakness in our largest national account, which is in the process of rebranding and remerchandising over 1,000 recently acquired stores. To put this in perspective, if we were to exclude the sales of our largest national account, in the third quarter of 2016 and 2015, our US sales would have been flat for the third quarter. We expect this transition of stores to be very successful, but we also expect it will continue to impact our sales for the remainder of 2016, *before improving in 2017. We are encouraged by the improved Tempur Sealy sales trends in the markets that have already undergone significant rebranding, and are thrilled to help where we can in this significant transition*." *Id.* 12–13 (citing JX 17); "As far as new ownership, look, we work with the Steinhoff Organization worldwide; in general we find them to be outstanding. And our balance of share has increased generally worldwide in markets that we have worked with them. And *we are wildly optimistic about the future for both the Mattress Firm team and Tempur Sealy*." *Id.* 13 (citing JX 17) (all emphasis supplied by Plaintiff).

36

accurate forecaster does not mean that his communications were false or misleading when made. Delaware law "'requires more than a divergence between forward-looking statements and subsequent results' to infer mismanagement or wrongdoing."[111]

Plaintiff also points to "the Company's SEC filings" where the Company failed to disclose "material information about the Company's relationship with its largest client."[112] Here again, Plaintiff presents no evidence to suggest that Tempur Sealy knew that it had something material to tell stockholders about Mattress Firm but intentionally declined to do so. The Company repeatedly disclosed the business risk of losing its largest customer after Mattress Firm's acquisition of Sleepy's and Steinhoff's acquisition of Mattress Firm. In the absence of any evidence of the imminent demise of the Mattress Firm relationship, I cannot conclude that there is a credible basis to suspect wrongdoing in the Company's failure to forecast such demise in public disclosures to stockholders.

Plaintiff again invokes *Express Scripts* to argue that this Court has already determined that disclosure allegations like his justify the inspection of books and records. Once again, Plaintiff's attempt to shoehorn his evidence into the *Express*

---

[111] *Haque v. Tesla Motors, Inc.*, 2017 WL 448594, at *5 (Del. Ch. Feb. 2, 2017) (internal citation omitted).

[112] JX 51.

*Scripts* holding falls short. As noted, the challenged statements from Express Scripts's president and senior vice president came after management had *proof in hand* that Anthem would cancel its contract unless Express Scripts cured its operational breaches.[113] In fact, Express Scripts admitted as much in its verified answer and counterclaims in the breach of contract litigation with Anthem.[114]

To reiterate, Plaintiff has failed to provide any evidence that Thompson knew his statements were false when made or that he did not believe the Company's future with Mattress Firm would be successful when he made his forward-looking statements to that effect. Plaintiff argues that the temporal relationship between Thompson's statements and the termination of the Agreements alone presents a credible basis to suspect that he knew his statements were false.[115] This temporal connection is too remote to constitute evidence of wrongdoing. Thompson told analysts he was "wildly optimistic about the future of Mattress Firm and Tempur Sealy" three months before Mattress Firm announced its intention to terminate its

---

[113] *Express Scripts*, 2017 WL 2352151, at *6.

[114] *Id.*

[115] Plaintiff also suggests that Thompson should have known Mattress Firm would terminate its contract because the Company pursued an aggressive negotiation strategy. Tr. 29 ("If you're adopting a hard-line posture, there's a question of whether you should be wildly optimistic about future success."). This is unconvincing given Mattress Firm's acknowledgment that Tempur Sealy's strategy yielded positive results until Mattress Firm gained bargaining leverage and demanded concessions to which Tempur Sealy could not agree. JX 32 ¶ 12–13.

contract. His other statements were even further removed from the termination. Considering that active negotiations continued right up to the Las Vegas convention where Mattress Firm announced its decision to terminate, I cannot conclude as factfinder that the timing of the termination in relation to the allegedly false statements supports any inference that the speaker knew the statements to be false.[116]

### III. CONCLUSION

For the foregoing reasons, the request to inspect Tempur Sealy's books and records is DENIED. Defendant shall submit a form of final judgment on notice to Plaintiff within ten (10) days.

---

[116] Plaintiff argues, and I agree, that Defendant cannot defeat Plaintiff's demand by pointing to Defendant's cherry-picked production of documents as definitive proof that Mattress Firm's termination was unexpected. I have not relied on Defendant's evidence (JX 79, Exs. A–D) as definitive proof that Tempur Sealy did not anticipate that Mattress Firm would terminate the Agreements. Rather, it is the absence of any evidence that Thompson or other Company representatives knew that their public statements (or omissions) were false when made that informs my finding that Plaintiff has not presented (as was his burden) any credible basis to suspect wrongdoing with respect to Thompson's public statements or the Company's public filings.